1

2

3

4

5

6

7

8
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

9

THE ESTATE OF GORDON ("CASEY")
10 POWELL, by and through its personal
representative, STEPHANIE POWELL
11 LEISURE; and GORDON CLAY POWELL,
SR., an individual,
12

13               Plaintiffs,

14        v.

15

GARY BARNES, an individual, BREEANN
16 CARAWAY, an individual, KERI WALTERS,
an individual, JEREMY SEELEY, an
17 individual, TOM TALBOT, an individual,
18 KEVIN BROWNE, an individual, ANDREW
HERBERT, an individual, CAMERON
19 JOHNSON, an individual, KELSEY MEYER,
20 an individual, ARTHUR DAVIS, an
individual, ADAM DEAL, an individual,
21 DONETTE ROTTA, an individual, and JOHN
DOES 1-XX, individuals, and JANE DOES 1-
22 XX, individuals,

23

24               Defendants.

NO. 2:16-cv-00352-JLR

AMENDED COMPLAINT

(JURY DEMAND)

25

26        Plaintiffs, by and through their attorneys, hereby allege as follows:

27

28

AMENDED COMPLAINT - 1

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

**PRELIMINARY STATEMENT**

1.      On May 9, 2015, Gordon ("Casey") Powell, a non-violent offender serving a sentence with the Washington Department of Corrections (DOC), was brutally attacked and stomped to death by a fellow prison inmate.  The unprovoked attack occurred in a common area of the Special Offender Unit at the DOC's Monroe Correctional Complex in Monroe, Washington.  The attacker was Benjamin Cory Price.  The defendant officers of the DOC knew, prior to the attack, individually and collectively, that Price was mentally unstable and posed an immediate threat to other offenders.  The defendant officers knew that Price had a history of viciously killing, attempting to kill, and threatening to kill others without provocation.  The defendant officers knew that Price suffered from extreme mental illness and that, when unstable or off baseline, he desired to kill others and to act on those desires.  The defendant officers knew that, as of the date of the murder, Price needed to be segregated from others and that failing to do so posed a grave and imminent threat to other offenders.  The defendant officers knew that permitting Price to mingle among other offenders created a high likelihood of danger (in form of death or serious bodily injury) to all those with whom he might come in contact.  Despite this knowledge and information, the DOC's officers failed to segregate Price and instead permitted him to share common areas with other offenders, including the decedent, Mr. Powell, in such a way that presented a substantial risk of serious bodily harm or death to them.  By doing so, the defendant officers were deliberately indifferent to Mr. Powell's constitutional and civil rights.  This is an action, brought pursuant to federal law, by the personal representative of Mr. Powell's estate, as well as his father individually, for damages arising from the foreseeable and preventable attack and killing described herein.

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060

**JURISDICTION AND VENUE**

2.    This Court has original jurisdiction over the plaintiffs' civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343.

3.    Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because all of the events that support the plaintiffs' allegations occurred in this judicial district and because the defendants reside in this judicial district.

**PARTIES**

4.    Plaintiff, the Estate of Gordon ("Casey") Powell (the Estate), was duly formed in the King County Superior Court under Cause No. 16-4-00177-4 SEA.  Plaintiff, Stephanie Powell Leisure, is the court-appointed personal representative for the Estate and the sister of the decedent.  As personal representative for the Estate, Ms. Leisure is qualified to bring the current action and assert the claims alleged herein on behalf of the Estate including all claims arising under 42 U.S.C. § 1983.

5.    Gordon Clay Powell Sr. is the father of Casey Powell.  He is a resident of Lewis County, Washington.  He and his son lived together for many years, including the years leading up to his incarceration at the DOC in the fall of 2014.  Mr. Powell Sr. is entitled to assert claims in his own individual capacity for the loss of the society and companionship of his son under 42 U.S.C. § 1983 and so asserts those claims as alleged herein.

6.    Defendant Gary Barnes is an individual residing in this judicial district.  At all times relevant hereto, Defendant Barnes was an officer with the Washington State Department of Corrections and was acting within the course and scope of his employment.  All acts and omissions of Defendant Barnes were done under color of state law and under the authority of his position as an officer with the DOC.

BUDGE⊕HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060

7.      Defendant BreeAnn Caraway is an individual residing in this judicial district.  At all times relevant hereto, Defendant Caraway was an officer with the Washington State Department of Corrections and was acting within the course and scope of her employment.  All acts and omissions of Defendant Caraway were done under color of state law and under the authority of her position as an officer with the DOC.

8.      Defendant Keri Walters is an individual residing in this judicial district.  At all times relevant hereto, Defendant Walters was an officer with the Washington State Department of Corrections and was acting within the course and scope of her employment.  All acts and omissions of Defendant Walters were done under color of state law and under the authority of her position as an officer with the DOC.

9.      Defendant Jeremy Seeley is an individual residing in this judicial district.  At all times relevant hereto, Defendant Seeley was an officer with the Washington State Department of Corrections and was acting within the course and scope of his employment.  All acts and omissions of Defendant Seeley were done under color of the state law and under the authority of his position as an officer with the DOC.

10.     Defendant Tom Talbot is an individual residing in this judicial district.  At all times relevant hereto, Defendant Talbot was an officer with the Washington State Department of Corrections and was acting within the course and scope of his employment.  All acts and omissions of Defendant Talbot were done under color of state law and under the authority of his position as an officer with the DOC.

11.     Defendant Kevin Browne is an individual residing in this judicial district.  At all times relevant hereto, Defendant Browne was an officer with the Washington State Department of Corrections and was acting within the course and scope of his employment.  All acts and omissions of

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060

Defendant Browne were done under color of state law and under the authority of his position as an officer with the DOC.

12.     Defendant Andrew Herbert is an individual residing in this judicial district.  At all times relevant hereto, Defendant Herbert was an officer with the Washington State Department of Corrections and was acting within the course and scope of his employment.  All acts and omissions of Defendant Herbert were done under color of state law and under the authority of his position as an officer with the DOC.

13.     Defendant Cameron Johnson is an individual residing in this judicial district.  At all times relevant hereto, Defendant Johnson was an officer with the Washington State Department of Corrections and was acting within the course and scope of his employment.  All acts and omissions of Defendant Johnson were done under color of state law and under the authority of his position as an officer with the DOC.

14.     Defendant Kelsey Meyer is an individual residing in this judicial district.  At all times relevant hereto, Defendant Meyer was an officer with the Washington State Department of Corrections and was acting within the course and scope of her employment.  All acts and omissions of Defendant Meyer were done under color of state law and under the authority of her position as an officer with the DOC.

15.     Defendant Arthur Davis is an individual residing in this judicial district.  At all times relevant hereto, Defendant Davis was a psychologist with the Washington Department of Corrections and an officer thereof and was acting within the course and scope of his employment.  All acts and omissions of Defendant Davis were done under color of state law and under the authority of his position as a psychologist and officer with the DOC.

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

16.     Defendant Adam Deal is an individual residing in this judicial district.  At all times relevant hereto, Defendant Deal was a mental health counselor with the Washington Department of Corrections and an officer thereof and was acting within the course and scope of his employment.  All acts and omissions of Defendant Deal were done under color of state law and under the authority of his position as a mental health counselor and officer with the DOC.

17.     Defendant Donette Rotta is an individual residing in this judicial district.  At all times relevant hereto, Defendant Rotta was a mental health counselor with the Washington Department of Corrections and an officer thereof and was acting within the course and scope of her employment.  All acts and omissions of Defendant Rotta were done under color of state law and under the authority of her position as a mental health counselor and officer with the DOC.

18.     Plaintiff anticipates that there will be other individual defendants, not currently known by name, who were employed by and/or were agents of the DOC and who bear liability for the allegations herein.  Because plaintiffs do not currently know the names of all such individuals, they are identified in this complaint as John and Jane Does 1-XX, and plaintiff may seek to amend this complaint to add them as individual defendants as discovery and investigation progress.  All acts and omissions of John and Jane Does 1-XX were done within the course and scope of their employment, under color of state law, and under the authority of their positions as officers with the DOC.

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

## FACTUAL ALLEGATIONS

19.     The DOC is responsible for administering adult corrections programs operated by the State of Washington including 12 adult prisons located statewide.  The DOC confines more than 15,000 offenders within its prison facilities.  Among the DOC's prisons is the Monroe Correctional Complex, located in Monroe, Washington.

20.     The majority of those confined at the DOC are non-violent offenders serving sentences of less than 10 years who generally pose little or no threat to their fellow offenders.  A small minority of prisoners, however, present an extraordinary danger of serious harm to their fellow offenders and others.  One such offender was Benjamin Cory Price ("Price").

21.     In late 2006, Price brutally killed a woman named Dawn Ruger by breaking her neck with his bare hands and/or by strangling her to death.  He then hid her body in a remote area of Whatcom County.  Approximately 18 months later, Price walked into the Whatcom County Sheriff's Office, confessed to the murder of Ms. Ruger, and led officers to her decomposed remains.  He was subsequently diagnosed with paranoid schizophrenia and/or other serious mental illnesses.  Price was criminally charged with murder, entered a plea of first degree manslaughter, and was sentenced to 12 years in state prison.  Following the sentence, Price was delivered to the custody of the DOC to serve his sentence and has been in DOC custody ever since.

22.     On April 18, 2011, Price attempted to kill again while confined at the DOC's Stafford Creek Correctional Center.  On that date, Price attempted to strangle another offender to death with a piece of bed sheet.  In admitting to the attack, Price stated, among other delusions, that he believed the other offender was "the devil" and that it was his role to kill him.  After the attempted killing on April 18, 2011, Price was transferred to the Monroe Correctional Complex, Special Offender Unit in Monroe, Washington for mentally ill offenders.

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060

23.     From the beginning of his confinement at the DOC and throughout his incarceration, Price gave numerous additional indications that he was violently psychotic and that he would likely attempt to kill another person if not stabilized. The DOC, through its officers, including the individual defendants herein, were aware of Price's homicidal history as well as the nature of his mental diagnoses and extreme violent tendencies.  It was well known, including by the individual defendants herein, that Price was extremely dangerous—particularly during periods when he was "off baseline."  Prison staff and other offenders were afraid of him.  Physicians and mental health providers were afraid of him. The DOC collected and amassed a file on Price confirming his homicidal history, mental illness, and violent tendencies.  Information indicating Price's dangerousness was freely shared among staff, including the individual defendants herein.  When Price was unstable or off baseline, he was required to be removed from the general population and placed in restrictive environments (or close observation areas) as a means of ensuring the safety of other offenders from Price.  These placements would be of varying duration, after which he would be moved back into the general population once stabilized. From approximately 2011 to 2014, Price was periodically noted to be highly unstable and dangerous.

24.     In 2014 and 2015, Price's symptoms of mental instability, violence, and dangerousness to others became increasingly apparent.  He was removed for placement in the close observation area in March 2014, July 2014, and again, in February 2015.  The bases for these placements included concerns for his ever increasing aggressiveness and dangerousness to others including off-baseline behavior where he demonstrated elevated levels of expressed emotions, fervent delusional beliefs, a refusal or inability to calm down when infected with a desire to kill or hurt, and an inability or refusal to engage in normal dialogue or interaction with others.  During periods where he was off-baseline, Price was even more dangerous than usual and possessed by a nearly uncontrollable urge to murder.

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060

25.     The DOC, through its officers, including the defendant officers, knew, or should have known, that Price, who was a large and strong individual, was easily capable of carrying out his desire to kill, even with his bare hands.  At times, Price even made his desires apparent.  During the time leading up to his killing of Mr. Powell, Price made numerous statements indicating that he was suffering from paranoid delusions, including consistently referring to himself as the "Arch Angel Michael" and the leader of "God's Angels"—statements consistent with his delusional belief that he was assigned to carry out murders of people he viewed as being in league with "the devil."  He demanded an audience with law enforcement and made statements indicating an intent to kill others at random as a means of gaining the attention of the police.  In the weeks, days, and hours leading up to the fatal assault that is the subject of this case, Price would walk around common areas with his fists clenched while opening and closing his eyes rapidly, yell at other offenders randomly for no apparent reason, pound on the walls of his cell with his fists, make delusional statements, and pace back and forth in an aggressive and pre-occupied state, among other off-baseline behaviors.

26.     Leading up to and including the very date of the fatal assault alleged herein, the DOC's officers, including the individuals named herein, were aware of Price's off-baseline behavior, knew that he was likely to carry out an unprovoked attack against one or more individuals at random, and knew that such an attack was likely to cause serious physical injury or death.  Despite this knowledge, the DOC's officers, including the individual defendants named herein, permitted Price to mingle among other offenders in such a way that he could easily carry out his compulsion to kill at will.  In so doing, the DOC and its officers were deliberately indifferent to the Eighth Amendment rights of other offenders in violation of the United States Constitution.

27.     The victim in this case, Gordon "Casey" Powell, entered the DOC in October of 2014.  In the fall of 2014, Mr. Powell was arrested in Lewis County, Washington for breaking the glass front

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

door of a distillery, stealing four bottles of liquor, and subsequently allegedly resisting arrest.  He pleaded guilty to second degree burglary and third degree assault and was sentenced by a Lewis County judge to a prison term of five years with time served and an earliest possible release date of February 3, 2018.  Mr. Powell was then delivered to the custody and control of the DOC.  He was thereafter transferred to the Monroe Correctional Complex to serve his sentence.  Mr. Powell had mental health issues and was therefore housed in the same Special Offender Unit at the Monroe Correctional Complex as was the violent and dangerous Price.

28.     Both Powell and Price were housed in Pod 2 of the E-Unit, a pod that houses approximately 40 offenders.  Price was tall, well-built, strong and approximately 35 years of age.  Powell was small and frail, being approximately 5 feet 7 inches tall and 130 pounds or lighter.  He was also approximately 10 years older than Price.  Powell was the smallest and frailest of all offenders housed with Price in Pod 2 of the E-Unit, a fact which made him especially vulnerable to an unprovoked attack by the homicidal Price.

29.     At the Monroe Correctional Complex Special Offender E Unit, offenders are generally let out of their cells to walk to Dining Hall #1 at the appointed time to receive an evening meal.  When the offenders are finished with dinner, they walk back to their pods.  When walking to and from dinner, and during the designated meal time, offenders mingle with and come into close contact with all other offenders who walk to and from the dining hall and who eat there.  It was the duty of the individual defendants to supervise offenders during these periods to protect offenders from violence at the hands of other offenders.

30.     As of May 9, 2015, the DOC's officers, including the individual defendants herein, should not have permitted Price to come into close physical contact with other offenders during meal and/or other periods due to his instability and off-baseline behavior and the danger he posed to other

BUDGE⚖HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

offenders.  Price needed to be segregated and closely observed until stabilized.  Such segregation and close observation is appropriate and required in the case of offenders, such as Price, who pose a significant danger to others.  The DOC's officers, including the individual defendants herein, failed, however, to adequately segregate Price and/or prevent his coming into close contact with other offenders.  Despite their knowledge and information that Price was homicidal and unstable and that he desired to kill someone, the DOC, through its officers, permitted Price to walk to and from the dining hall with other offenders and eat with other offenders, during which time he could carry out his compulsion to hurt and/or kill.

31.     On May 9, 2015, Price was clearly exhibiting his off-baseline, aggressive, delusional, and dangerous behavior.  Although this behavior was seen and noticed by the DOC's officers, including the individual defendants herein, no action was taken to segregate Price or otherwise protect other offenders from him.  For example, in the early morning hours of May 9, 2015, Price was explicitly noted to be "off his base line" by Defendant Walters who called and alerted other corrections officers of his behavior.  This off baseline behavior was also documented in the log book.  Price's instability indicated the likelihood of an imminent and unprovoked attack.  Despite this knowledge, no action was taken to segregate Price or protect other offenders from him.

32.     Later in the day on May 9, 2015, other defendants arrived to begin their shifts.  Their duties included the supervision of offenders during dinner and when such offenders are walking to and from the dining area.  Before beginning their shifts, these defendants were explicitly advised by other officers about Price's off baseline behavior and that "Price was slipping," in reference to his deteriorated mental state. Despite these warnings, defendants failed to segregate Price, instead permitting him to engage in the usual contact with other offenders described above.  Knowing that he posed an imminent danger of serious bodily harm to other inmates, defendants allowed Price to freely

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

mingle with other offenders during meal time.  Mr. Powell was one of many offenders who was forced to into close proximity with Price during this period.

33.     During the meal period, Price continued to behave in a way that was clearly off baseline. Among other things, he was acting very agitated, speaking in a loud voice in a delusional manner and/or to himself, mumbling incoherently, failing to make eye contact with anyone, and failing to focus on anyone.  Defendants continued to recognize that Price was off baseline and that he posed an imminent risk of serious bodily harm, but they still took no action to segregate him from other offenders.

34.     At the conclusion of the May 9th meal period referenced above, offenders, including Price, Mr. Powell, and others, were returning to their cells from the dining hall.  At some point before 4:37 p.m., Price stopped walking and stood against the wall rather than continuing to proceed towards his cell.  Price was waiting for Powell to come near to him, so that he could kill him.  DOC officers, including defendants, noticed this behavior but took no action in response to segregate him or otherwise attempt to prevent an attack.

35.     As Mr. Powell approached the area where Price was standing and waiting, Price launched an unprovoked and vicious physical attack against him.  As the attack began, a terrified Mr. Powell exclaimed, "What did I do?" and "Stop! Stop!" but he was almost totally incapable of defending himself from the attack and could not repel it.  Upon being attacked, Mr. Powell fell to the ground, whereupon Price began kicking and stomping on his head in an attempt to crush his skull.  Price repeatedly stomped on Mr. Powell's head with full force, in an attempt to kill him.  When the attack was over, Mr. Powell was unconscious and near death from trauma to his brain.

36.     Mr. Powell was taken to Providence Hospital in Everett where he was diagnosed with a traumatic head injury and placed on life support.  On May 18, 2015–approximately nine days after the attack–life support was deemed to be futile and withdrawn.  Mr. Powell thereafter succumbed to his

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060

1   injuries and died.  The cause of his death was devastating trauma to his brain.  In confessing to the

2   attack at a later date, Price stated, "I have been asking to talk to law enforcement.  I told them I was

3   going to kill someone if I did not get help.  I tried to kill him so I could talk to the Sheriff."

4   37.    Price's medical records, mental health records, central file records and other records

5   will further confirm his mental illness, homicidal tendencies, the extraordinary danger he posed to other

6   offenders, and information and knowledge of such by the DOC and its officers.

7   38.    Price was subsequently charged with first degree aggravated murder by the Snohomish

8   County Prosecuting Attorney.

9   39.    The conditions of Mr. Powell's confinement at the DOC's Special Offender Unit at the

10  Monroe Correctional Complex presented a substantial risk of serious harm to him, insofar as he was

11  confined in close proximity to an unstable homicidal maniac with a history of killing and a present

12  desire to kill without reason, provocation, or justification.  The danger was known and appreciated by

13  the DOC through its officers, including the individual defendants herein.  Prison officials, and DOC

14  officers including the individual defendants herein, were aware of the clear and present danger to Mr.

15  Powell and other offenders but disregarded the danger and failed to take appropriate steps required by

16  the Eighth Amendment of the Constitution to protect the other offenders from the dangers posed by

17  Price.

18  40.    The failure by the DOC, through its officers, including the individual defendants herein,

19  to protect Mr. Powell from the known and obvious threat presented by Price was deliberately indifferent

20  to the Eighth Amendment rights of Mr. Powell and other offenders.  It was foreseeable that the failure

21  to segregate Price from other offenders and take reasonable measures to protect them from him (and

22  instead allowing Price to mingle with them in close proximity where he could freely carry out his desire

23  to kill) would lead to the death or serious bodily injury of an offender such as Mr. Powell.  Mr. Powell's

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

death was caused by the defendants' breaches of their constitutional obligations to the offenders over whom they had custody and control and to whom they were responsible, including Mr. Powell

41.    By the unconstitutional actions and omissions of the individual defendants herein, defendants violated the Fourteenth Amendment right of Gordon Powell, Sr. to the society and companionship of his son.

42.    With regard to all alleged constitutional violations alleged herein, the individual defendants acted with at least reckless disregard to plaintiffs' well-established constitutional rights.

ADDITIONAL FACTUAL ALLEGATIONS WITH REGARD TO
DEFENDANTS DAVIS AND DEAL

43.    Plaintiffs hereby re-allege and incorporate the foregoing allegations with regard to Defendants Davis and Deal. In addition, by way of the following paragraphs, which form the core of the amendments to this Complaint, Plaintiffs make additional specific factual allegations against Defendants Davis and Deal to support Plaintiffs' Eighth and Fourteenth Amendment claims against them pursuant to 42 U.S.C. § 1983.

44.    Defendant Davis was, at all material times, a psychologist assigned to provide mental health evaluation and treatment to offenders at the Monroe Correctional Complex Special Offenders Unit.  In particular, Defendant Davis was, at all material times, assigned to provide mental health evaluation and treatment to offenders in the E-unit, including offenders in Pod-2.  Defendant Davis was the assigned psychologist for Price. In connection therewith, Defendant Davis had an obligation and duty to evaluate and treat Price and to be aware of issues concerning Price's mental health, including issues that might indicate that Price posed an unreasonable risk of serious harm against other offenders in the E-unit. Defendant Davis further had an obligation to take appropriate action to segregate or isolate Price from the rest of the E-unit offender population if Defendant Davis became

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

aware of information to indicate that Price was reasonably likely to pose a risk of serious harm to other offenders in the E-unit. Defendant Davis was aware of all the information contained in the following paragraphs 46.A-Y, which, individually and collectively, indicated that Price's continued presence on the E-unit posed an unreasonable and substantial risk of serious harm to other offenders in the E-unit, including Mr. Powell. Despite this knowledge, Defendant Davis failed in his duty to take appropriate action to segregate or isolate Price from the rest of the offender population in the E-unit, including Mr. Powell. By failing to take appropriate action to segregate or isolate Price from the rest of the offender population in the E-unit, including Mr. Powell, and instead allowing him to remain on the E-unit in such a way that he could freely intermingle with and come into close physical proximity with Mr. Powell and other offenders, Defendant Davis was deliberately indifferent to Mr. Powell's Eighth Amendment right to be free from an unreasonable risk of serious bodily harm by Price. This deliberate indifference caused the damages alleged in this Amended Complaint including Mr. Powell's death and pre-death suffering and Mr. Powell, Sr.'s loss of the society and companionship of his son. In so doing, Defendant Davis acted outrageously and in such a way that shocks the conscience and which was, at a minimum, in reckless disregard to plaintiffs' well-established constitutional rights.

45.     Defendant Deal was, at all material times, a mental health counselor assigned to provide mental health evaluation and treatment to offenders at the Monroe Correctional Complex Special Offenders Unit.  In particular, Defendant Deal was, at all material times, assigned to provide mental health evaluation and treatment to offenders in the E-unit, including offenders in Pod-2.  Defendant Deal was the assigned mental health counselor for Price. In connection therewith, Defendant Deal had an obligation and duty to evaluate and treat Price and to be aware of issues concerning Price's mental health, including issues that may indicate that Price posed an unreasonable risk of serious harm against other offenders in the E-unit. Defendant Deal further had an obligation to take appropriate action to

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

segregate or isolate Price from the rest of the offender population in the E-unit if Defendant Deal became aware of information to indicate that Price posed an unreasonable risk of serious harm to other offenders in the E-unit. Defendant Deal was aware of all the information contained in the following paragraphs 46.A-Y, which, individually and collectively, indicated that Price's continued presence on the E-unit posed an unreasonable and substantial risk of serious harm to other offenders in the E-unit, including Mr. Powell. Despite this knowledge, Defendant Deal failed in his duty to take appropriate action to segregate or isolate Price from the rest of the offender population in the E-unit, including Mr. Powell. By failing to take appropriate action to segregate or isolate Price from the rest of the offender population in the E-unit, including Mr. Powell, and instead allowing him to remain on the E-unit in such a way that he could freely intermingle with and come into close physical proximity with Mr. Powell and other offenders, Defendant Deal was deliberately indifferent to Mr. Powell's Eighth Amendment right to be free from an unreasonable risk of serious bodily harm by Price. This deliberate indifference caused the damages alleged in this Amended Complaint including Mr. Powell's death and pre-death suffering and Mr. Powell, Sr.'s loss of the society and companionship of his son. In so doing, Defendant Deal acted outrageously and in such a way that shocks the conscience and which was, at a minimum, in reckless disregard to plaintiffs' well-established constitutional rights.

46.     Defendants Deal and Davis were both part of the Price's mental health "team" and were each fully familiar with the same information as the other, including all information outlined below regardless of its original source or author. The information about which Defendants Davis and Deal were aware included the information alleged in the foregoing paragraphs, as plead in the original complaint, and also includes, but is not limited to, the following specific information:

A.     At all material times, Defendants Davis and Deal were aware of Price's specific mental diagnoses, which were made and confirmed repeatedly by Deal and Davis throughout the time that

BUDGE☙HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

Price was housed on the E-unit. Among other diagnoses, Price was assessed and found to be suffering from a severe case of paranoid schizophrenia juxtaposed with antisocial personality disorder with psychopathic features. Paranoid schizophrenia, as suffered by Price, is a mental disorder in which a person loses touch with reality and whose mental state is dominated by irrational and uncontrollable delusions and hallucinations that cause a person to behave irrationally. Antisocial personality disorder, as suffered by Price, is a mental disorder in which a person consistently shows no regard for right or wrong, ignores the rights and feelings of others, lacks the ability to empathize, lacks the ability to feel guilt or remorse for his behavior, and is prone to committing anti-social acts against others including, but not limited to, assaultive behavior. Combined, these mental disorders, in and of themselves, made Price particularly dangerous and prone to committing acts of violence against others, including other offenders. Defendant Deal has acknowledged in sworn deposition testimony that Price's mental diagnoses presented "a dangerous combination of psychological features." In fact, as described in more detail below, Price was extraordinarily prone to violence, as he was under the firm and fervent delusional belief that he was being trained as a killer and that he was receiving messages commanding him to engage in homicidal acts which he was unable to resist.

B.      Deal and Davis further knew that Price had attempted to kill other offenders at the DOC as the result of his highly-compromised mental condition. The DOC maintained an "Offender Profile" on Price. Deal and Davis were well aware of Price's Offender Profile which, among other things, detailed his criminal history, movements, and infraction history at the DOC. Price's Offender Profile indicated, among other things, that on April 18, 2011, while incarcerated at the DOC, Price was found to have committed an aggravated assault on his then-cellmate by attempting to strangle his cellmate to death with a torn piece of bed sheet. The Offender Profile further indicated that following the assault, Price stated that he committed the assault as the result of "hearing voices telling him his new cellie

BUDGE⊕HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

would be the devil" and that "he knew that he was the devil" and that he "planned to kill him" as a result of these mental delusions. Defendants Deal and Davis were well aware, prior to May 9, 2015, that Price had an actual history of assaulting and attempting to kill other DOC offenders based on delusions of being commanded to do so caused by his severely compromised state of mental health.

C.      On October 9, 2013, Exactly 19 months before the fatal assault against Mr. Powell by Price, Defendant Davis received an e-mail from Corrections Officer Robert Patton. The e-mail enclosed an "observation report" by Corrections Officer Patton informing Defendant Davis of concerning behavior by Price. Among other things, Corrections Officer Patton informed Davis of Price's "loud and disruptive outbursts" and his actions of "walking around the dayroom with clenched fists." The e-mail further advised Defendant Davis that Price was walking around the common dayroom yelling obscenities and making "very disturbing statements" to a mental health counselor involving "raping" and "torturing." The e-mail informed Defendant Davis that Price's behavior was "potentially predatory and provocative" and that his behavior was "unacceptable" and "very disturbing to say the least." The e-mail informed Defendant Davis that Price's "clenching of the fists and the use of violent terms against other persons" was very disturbing and further advised Defendant Davis that a mental health counselor had complained that Price was walking too close to her and engaging in "perceived act[s] of aggression" that posed a "problem with maintaining safety and security on the unit for inmates and staff alike" that could be "potentially predatory behavior" and that was "unacceptable."

D.      A mental health counselor named Gazelle Williams worked at the E-unit of the MCC and repeatedly expressed grave concerns about Price's dangerousness which were informed by her professional judgment and interactions with him. Among other things, Ms. Williams expressed that, based on her personal observations, training and experience, Price was physically dangerous and made her highly uncomfortable and concerned for her own physical safety due to his bizarre, aggressive, and

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

intimidating behavior. While Ms. Williams expressed grave concerns to both Defendants Deal and Davis, these concerns were disregarded. In particular, Defendant Davis unreasonably dismissed Ms. Williams's reports as the result of her being overly sensitive rather than grounded in professional judgment, observation and experience.

E.      On November 4, 2013, approximately 18 months before the fatal assault against Mr. Powell by Price, Corrections Officer Patton wrote another e-mail to Defendant Davis on the subject of Price's "violent statements" and other concerning and threatening behavior. Corrections Officer Patton informed Defendant Davis, among other things, that Price was engaging in "totally unacceptable" behavior on the E-unit including, but not limited to, his repeated loud yelling of "I will fucking kill you!" and other "violent statements" which were described by Corrections Officer Patton as a "continued escalation" that had been occurring over the course of time. Corrections Officer Patton specifically advised Defendant Davis, in writing, of his "concern[s] for the safety of staff (and inmates for that matter too.)."

F.      On February 26, 2014, approximately 14 and ½ months before the fatal assault against Mr. Powell by Price, Corrections Officer Patton wrote yet another e-mail to Defendants Davis and Deal. Among other things, Corrections Officer Patton advised Defendants Davis and Deal of Price's continued uncontrollable yelling on the E-unit, and behavior that was extremely disruptive. Corrections Officer Patton advised Defendants Deal and Davis that such conduct, which "is not the first incident" involving Price, could result in "a [u]se of [f]orce incident with inmates" and that prudence demanded that Price be considered for removal from the E-unit.

G.      On or about March 25, 2014, Corrections Officer Tom Talbot went to Defendant Deal to inform Defendant Deal that Price was making "threatening comments" and "walking quickly around the [common area] dayroom displaying aggressive gestures." Price was evaluated by Defendant Deal

BUDGE ⊛ HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

and found to be "angry and threatening" and "observed making intimidating gestures to staff members such as pointing to his eyes and then pointing to staff members as if he were communicating, 'I'm watching you.'" Price was further observed to be suffering from delusions involving the FBI and "aliens" and to be "threatening," making "intimidating remarks [and] rapid body movements" and was deemed to be a potential safety threat due not only to his behavior but also due to his inability to be directed by unit staff.

H.     On or about March 26, 2014, approximately 13 and ½ months before the fatal assault against Mr. Powell by Price, Defendant Davis learned from E-unit staff that Price was "bizzare and menacing on the unit" and that he was "aggressive" and incapable of being directed by E-unit staff due to his psychotic delusions.

I.     On or about March 27, 2014, Price was evaluated by Defendant Davis due to "disruptive behavior" and was found to be expressing delusional beliefs about the FBI and "demonic psychological intrusions." Defendant Davis noted that Price "has murdered while operating under delusional beliefs."

J.     Based on their professional judgment about Price, as well as their own knowledge, information and experience with Price, Defendants Deal and Davis were very concerned for their own personal safety when it came to Price. For example, Defendants Deal and Davis believed that Price was such a danger that, in contrast to usual procedures, they decided that defendant Deal would never meet alone with Price out of concerns that Price might launch an unprovoked physical attack against his provider. Indeed, Defendant Davis instructed Defendant Deal that he should never meet alone with Price. Defendant Deal has given deposition testimony agreeing that "Price ma[de] him feel uncomfortable for [his] own physical safety" and that in the course of his entire career at the DOC, no other offender among the 60-70 offenders to whom he had been assigned, had ever made him feel as uncomfortable for his own physical safety as did Price. Defendant Deal has further acknowledged in

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

his deposition testimony that he was in fear of Price, that he "fe[lt] that Price had the potential to quickly become violent and seriously hurt [him]," and that he believed that Price similarly had the potential to quickly become violent and seriously hurt other offenders in the E-unit. In an e-mail written by Defendant Davis five days following the fatal assault against Mr. Powell by Price, Defendant Davis acknowledged to other DOC staff members that, for approximately one year before the fatal assault, he "instructed [Defendant Deal] not to meet alone with Mr. Price given Mr. Price's aggressive temperament" and that other counselors had to be re-assigned away from Price "for the same reason" and that other counselors had expressed their significant concerns about Price. In fact, it was known to Defendants Deal and Davis that other mental health counselors had refused to meet with Price due to concerns for their own physical safety. Defendant Davis acknowledged in the same e-mail that Price "ha[d] been the subject of concern for years" and that he and others had had "concerns about Mr. Prices (sic) aggressiveness for as long as he has been here."

K.      On May 19, 2014, approximately one year before Price's fatal assault against Mr. Powell, Defendant Davis assessed Price. Among other things, Defendant Davis concluded that Price continued to suffer from delusions involving the "CIA, NSA, etc." and that Price believed his past murderous behavior was completely justified by his continuing psychotic delusions that his murder victim was "evil and [he] had to kill her" and that she had "put spells on [him]" among other things. Price spoke of his mother as "a corpse feeding upon itself" and Defendant Davis concluded that Price "may have committed other crimes about which he might be more deeply disturbed." Defendant Davis was further advised, on or about May 19, 2014, that, in the E-unit, Price had been observed by corrections officer screaming, "Get away from me you little bitch or I will kick you so hard blood will come out of your ass."

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

L.     On June 11, 2014, approximately 11 months before Price's fatal assault against Mr. Powell, Defendant Deal assessed Price. Among other things, Price was suffering from a variety of delusions, spoke of his "visions and powers" and became "visibly angry" and irrationally "began cursing at Defendant Deal."

M.     On June 16, 2014, less than 11 months before Price's fatal assault against Mr. Powell, Defendants Davis and Deal assessed Price. Among other things, this assessment revealed that Price was fixed on the delusional belief that he was "psychic" and that his crime of murder was due to military orders given by the FBI. Price was observed to be vehement in his delusions, and was operating under the continuing delusional belief that his murder victim was a "witch who deserved to die and he killed her because he had to." In the course of the assessment, it was further found that Price was operating under the delusional belief that he has "been a trained, contracted killer" and that he had been following orders to kill. Price indicated that he *must follow orders to kill.*" (Emphasis added.) Price was found to be illogical, paranoid, hostile, and aggressive, denied responsibility for his "previous murderous behaviors," and "expressed strong justification for his crime of murder." Price stated that he could not be guilty of murder because he was "carrying out orders." Defendant Davis concluded that Price was "*a clear and present danger* to others in the community." (Emphasis added.)

O.     On July 23, 2014, less than 10 months before Price's fatal assault against Mr. Powell, Defendant Davis received information from corrections officers on the E-unit to cause him to conclude, "PATIENT IS VERY PSYCHOTIC AND VERBALLY AGGRESSIVE." Defendant Davis evaluated Price and, based on his evaluation concluded, among other things, that Price was "vehement and aggressive," very delusional" and "potentially harmful."

P.     On December 2, 2014, approximately five months before Price's fatal assault against Mr. Powell, Defendant Deal evaluated Price. Price was found to be under the delusional belief that he

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

had psychic powers, that he was being tormented by supernatural forces, that he was under the control of the FBI, and that he was able to gather information from his mental health counselor in the form of "colors and vibrations emanating from [his] body." Defendant Deal concluded that Price was suffering from visual hallucinations and grandiose delusions consistent with his ongoing diagnosis of paranoid schizophrenia and antisocial personality disorder which, according to Defendant Deal, is a "dangerous combination of psychological features."

Q.     On December 29, 2014, approximately four and ½ months before Price's fatal assault against Mr. Powell, Defendant Davis evaluated Price and found Price to be suffering from continuing delusions that he was being tortured by the NSA, FBI and CIA and that these agencies were "responsible for giving him the directive to kill his victim." Defendant Davis was further requested by corrections officers to remove Price from the unit due to concerns about his behavior, but Davis declined to do so. Defendant Davis noted that Price "expressed dangerous thoughts and fears about his vulnerability with regard to being 'forced' by a third party to kill again" and indicated that "he has little or no control over the entity that controls him and made him kill in the past."  Defendant Davis diagnosed Price as suffering from "[a]cute [s]chizophrenia *with delusions involving killing others by contract.*" (Emphasis added.)

R.     On January 4, 2015, approximately four months before Price's fatal assault against Mr. Powell, Price was evaluated by Defendant Deal. In this evaluation, Price continued to suffer from the symptoms of acute schizophrenia with delusions that he was being commanded to carry out acts of murder. Among other things, Defendant Deal concluded that Price was under the belief that "*he is being conditioned by the government to become a secret assassin [i.e., a killer] for the FBI.*" (Emphasis added.) Price expressed other delusions involving government control, and was very agitated, telling Defendant Deal, "You can go to hell!" before ending the session.

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

S.      On January 12, 2015, less than four months before Price's fatal assault against Mr. Powell, Price was evaluated by Defendant Davis. Defendant Davis continued to diagnose Price as suffering from "acute schizophrenia with delusions involving killing others by contract." In fact, these delusions were extreme and specific. Among other things, Price "insist[ed] he is a government agent" and that he is "*an assassin trained to kill for the government.*" (Emphasis added.) Price was under the firm belief that, rather than being in prison, he was "*currently placed in a (sic) NSA training camp to learn how to be an effective assassin.*" (Emphasis added.) Defendant Davis opined that Price's delusions of training to kill others were densely paranoid and that his denial of reality was "dense as well," meaning that it would be very difficult to bring Price out of his delusions that he was training to be a killer. Defendant Davis further opined that Price's "self esteem seems to be linked to his anti-social behaviors," meaning that Price's sense of self-worth derived from his carrying out anti-social behavior against others. Defendant Davis concluded that Price was "a dangerous psychiatric patient."

T.      On February 9, 2015, exactly three months before Price's fatal assault against Mr. Powell, Defendant Davis evaluated Price again and continued to diagnose him as suffering from "[a]cute [s]chizophrenia with delusions involving killing others by contract."

U.      For a period of several months, leading up to the weeks and days before the fatal assault against Mr. Powell, Defendant Davis received multiple oral reports from corrections officers on the E-unit advising him that the corrections officers believed, based on their observations of Price, experience and professional judgment, that Price was a clear and present danger and needed to be removed from the E-unit or isolated and segregated away from them and other offenders due to the extraordinary danger he posed to staff and other offenders alike. Corrections Officer Tom Talbot was one such corrections officer. According to sworn deposition testimony by Corrections Officer Talbot, he repeatedly went to Defendant Davis and personally "begged Dr. Davis to take Price off the unit"

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

because he "was concerned he was dangerous" to staff and offenders both. On repeated occasions, Corrections Officer Talbot went to Defendant Davis and "begged him to remove Price from the unit" by "clearly and unambiguously tell[ing] Dr. Davis that [he] believed Price posed a physical threat to the offenders and staff on the unit." Corrections Officer Talbot told him on each of those occasions that he "wanted Price off the unit because [he] was concerned that Price might hurt or attack somebody on the unit." Corrections Officer Talbot believed, based on his observations about Price's behavior on the unit, that "Price posed an imminent danger of serious harm to offenders and staff on the unit" and he told Defendant Davis "that [he] thought Price was a clear and present danger to the offenders and staff on the unit." Corrections Officer Talbot made Defendant Davis aware that he was "not alone in [his] feelings about Price posing a danger to other offenders on the unit" and told Defendant Davis that "other corrections officers working on the unit felt the same way as [he] did from their observations." Similar concerns were orally communicated to Defendant Davis in the months, weeks, and/or days leading up to the fatal assault by other corrections officers including Corrections Officers Robert Patton, Cameron Johnson and/or others. Rather than acting on this information, however, Defendant Davis unreasonably dismissed these first-hand reports, spoke down to the corrections officers, and refused to take any responsive action.

V.     On or about February 19, 2015, Defendants Deal and Davis became aware of additional information about Price from an Advanced Registered Nurse Practitioner who saw Price due to increased reports of psychiatric symptoms. Among other things, the nurse reported that Price was loud and aggressive and threatening, that he could not calm down, that he was delusional, and that he was under the specific delusional belief that he was being trained to "*become an assassin, a killer*" (emphasis added) and that he was "unable to control [him]self."

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

W.      On March 10, 2015, Defendant Deal prepared a full 4-page mental health update on Price. In preparing the report, Defendant Deal acknowledges in his deposition that he knew that "Price was under the firm belief that he was training to be an assassin, a killer," that he was psychotic and had the dangerous diagnosis of antisocial personality disorder married with paranoid schizophrenia and that his specific paranoid schizophrenic delusions involved killing others by contract. Defendant Deal further acknowledges that, at the time he prepared the report, he knew it was the professional judgment of Defendant Davis that Price was a "dangerous mentally ill offender," that Price "had great difficulty controlling his impulses" and had homicidal thoughts. Defendant Deal's March 10th report noted, among other things, that Price was suffering from visual, auditory, tactile and olfactory hallucinations, that he believed he was the son of God, that he believed himself to be receiving messages from the FBI and CIA through quantum computing technology constructed by aliens, and that he had special psychic abilities. The March 10th report further found that Price's delusions were extreme, that he was extremely difficult to treat, that he often verbally attacked his providers and refused to participate in treatment, that he was highly psychotic, that he had no sense of remorse or guilt for the underlying crime involving the killing and dismemberment of Dawn Ruger, that he "had to do it" because his victim was a "witch" whom he had been ordered to kill by the CIA, that he refused to attend groups, was not amenable to treatment, verbally attacked his providers and stormed out of the room, yelled "fuck you, you piece of shit" to corrections officers, that he made obscene gestures to corrections staff, that he engaged in disruptive behavior on the E-unit, that he refused to meet for treatment sessions, that treatment of Price had been ineffective, that his psychosis was growing progressively worse and worse, and that Price painted a "perplexing" diagnostic picture.

X.      On May 3, 2015, less than one week before Price fatally assaulted Mr. Powell, Defendant Deal again evaluated Price. Price resisted the evaluation, but then expressed a variety of

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

delusions including "that the CIA is physically torturing him and *training him to be an assassin*" (Emphasis added.) After again noting that Price was under the continuing delusional belief that he was being trained to kill, Defendant Deal concluded that Price "does not appear amenable to treatment at this time."

Y.      On May 4, 2015, five days before Price fatally assaulted Mr. Powell, Defendant Davis evaluated Price. Price further reiterated his continuing delusion that "he worked for the government and followed their orders when he killed his victim." Price continued to express the "delusional belief [that] *he is an assassin for the government*."

47.     All of the information in the foregoing paragraphs, individually and collectively, as well as additional information possessed by Defendants Deal and Davis, should have caused them to remove Price from the E-unit or otherwise segregate or isolate Price from other offenders prior to the time of Price's fatal assault against Mr. Powell. However, Defendants Deal and Davis failed to remove Price from the E-unit or otherwise segregate or isolate Price from other offenders. Instead, they permitted Price to remain on the E-unit where they knew he would share common areas with other offenders throughout the course of every day in such a way that he would be in close physical proximity to them and could carry out an unprovoked attack virtually at will. In failing to remove Price from the E-unit, or otherwise segregate or isolate Price from other offenders, Defendants Deal and Davis acted with deliberate indifference and further acted outrageously and in such a way that shocks the conscience and with at least reckless disregard to Mr. Powell's Eighth Amendment right to be free from an unreasonable risk of serious bodily harm. The actions and omissions of Defendants Deal and Davis resulted in the unprovoked fatal attack (effectively an "assassination") being allowed to occur, caused Mr. Powell's death and pre-death pain and suffering, and caused Mr. Powell, Sr. to be deprived of the society and companionship of his son in violation of his Fourteenth Amendment rights.

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

ADDITIONAL FACTUAL ALLEGATIONS WITH REGARD TO
DEFENDANT ROTTA

48.     Plaintiffs incorporate and re-allege the previous paragraphs of this complaint.

49.     At all material times, Defendant Rotta was a mental health counselor and officer of the DOC working at the E-unit. Defendant Rotta was on duty as a mental health counselor on the E-unit on May 9, 2015, the date of the fatal assault against Mr. Powell by Price.

50.     On the morning of May 9, 2015, Defendant Corrections Officer Keri Walters observed Price at the morning meal period. Ms Walters specifically noted that Price appeared to be off his baseline. Among other things, Price was acting in a very agitated way that was outside the norm for even the volatile and disruptive Price. Indeed, Defendant Walters has admitted in her deposition that she had previously observed Price during the course of at least 2000 previous meal periods and had never before seen Price off his baseline prior to May 9, 2015. Upon observing Price off his baseline, Defendant Walters picked up the telephone in or near the dining hall and called the E-unit officers on duty at approximately 6:41 a.m. to report that Price was off his baseline. The E-unit officer then made an entry in the log book at the E-unit control desk at 6:41 a.m. noting that Defendant Walters had called to report that Price was off his baseline. As indicated elsewhere in this complaint, off baseline behavior by Price should have prompted his immediate evaluation and removal from the E-unit by so that he could be isolated or segregated away from other offenders.

51.     One of the primary duties of the mental health counselors working on the E-unit was to review any and all log book entries promptly upon coming on duty. If any offender was noted to be off baseline, it was the duty of that mental health counselor to promptly evaluate the offender and remove him from the E-unit or otherwise isolate or segregate him from other offenders upon confirmation of

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE:  (206) 624-3060

1    off baseline behavior. The mental health counselor to whom this duty fell on May 9, 2015 was

2    Defendant Rotta.

3        52.    Defendant Rotta reviewed the log book at 8:21 a.m. which clearly and unambiguously

4    indicated that Price had been observed to be off his baseline less than two hours earlier. Defendant

5    Rotta knew, based on her review of the log book at 8:21 a.m., that Price had been observed to be off

6    his baseline less than two hours earlier. This information should have prompted Defendant Rotta to

7    immediately evaluate Price and then remove him from the E-unit or take steps to isolate or segregate

8    him from other offenders. However, Defendant Rotta failed to evaluate Price or take any steps to

9    remove him from the E-unit or otherwise isolate or segregate him from other offenders. Despite being

10   fully aware of the 6:41 a.m. log book entry, Defendant Rotta took no action in response to it, instead

11   permitting Price to remain on the E-unit where she knew he would share common areas with other

12   offenders throughout the course of the day, come into close physical proximity to them, and pose a

13   substantial risk of serious harm by being permitted to remain on the unit in an off-baseline state. By

14   failing to take any action whatsoever in response to the 6:41 a.m. log book entry that Price was off his

15   baseline, Defendant Rotta acted with deliberate indifference and further acted outrageously and in such

16   a way that shocks the conscience and with at least reckless disregard to Mr. Powell's Eighth

17   Amendment right to be free from an unreasonable risk of serious bodily harm. The actions and

18   omissions of Defendant Rotta resulted in the unprovoked fatal attack being allowed to occur

19   (approximately 10 hours after Price was noted to be off his baseline and approximately eight hours

20   after Rotta noticed the log book entry) and caused Mr. Powell's death and pre-death pain and suffering,

21   and caused Mr. Powell, Sr. to be deprived of the society and companionship of his son in violation of

22   his Fourteenth Amendment rights.

BUDGE&HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060

## CLAIMS

53.     Stephanie Powell Leisure, the Personal Representative for the Estate, asserts all available claims under 42 U.S.C. § 1983 for the deprivation of Mr. Powell's constitutional rights under the Eighth Amendment to the United States Constitution.

54.     Mr. Powell, Sr., as the father of Mr. Powell, possesses his own independent claims under 42 U.S.C. § 1983 for the deprivation of the society and companionship of his son in violation of the Fourteenth Amendment to the United States Constitution and asserts those claims herein on his own behalf.

## DAMAGES

55.     Damages have been suffered by all plaintiffs herein.  These include damages for the pain and suffering experienced by Mr. Powell prior to his death, damages for Mr. Powell's loss of enjoyment of life and for the loss of Mr. Powell's life, economic damages (including, but not limited to, medical expenses, funeral expenses, and other claims for economic damages), and damages to Mr. Powell, Sr. for his own loss of society and companionship of his son in violation of the United Sates Constitution.  To the extent any state law limitations on such damages are purported to exist, they are inconsistent with the compensatory, remedial, and/or punitive purposes of 42 U.S.C. § 1983, and any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

## JURY DEMAND

56.     Plaintiffs demand that this matter be tried by a jury.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays that the Court award:

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060

A.    Compensatory damages in an amount to be proven at trial, sufficient to compensate all plaintiffs for all damages under federal law including, but not limited to, damages for pre-death pain and suffering, damages for loss of enjoyment of life and loss of life, economic damages, and damages to Mr. Powell, Sr. for the loss of society and companionship of his son;

B.    Punitive damages under federal law, in an amount to be proven at trial;

C.    A declaration that the acts of the defendants violated the United States Constitution and an award of nominal damages for any such violation as deemed appropriate;

D.    Attorneys' fees, costs, and prejudgment interest incurred in pursuing this action as provided for in 42 U.S.C. § 1988; and

E.    Any such other relief that this Court deems just and equitable under the circumstances of this case.

AMENDED COMPLAINT DATED this 10th day of January, 2017.

BUDGE & HEIPT, PLLC

_/s/_ *Edwin S. Budge*

_/s/_ *Erik J. Heipt*

Edwin S. Budge, WSBA # 24182
Erik J. Heipt WSBA #28113
Of Budge & Heipt, PLLC
Attorneys for Plaintiffs

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA 98104
TELEPHONE: (206) 624-3060

1
2

## CERTIFICATE OF SERVICE

3
     The undersigned hereby declares that he caused the foregoing document to be electronically

4
filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

5
to the following:

6
     Deborah A. Severson:     deborahs1@atg.wa.gov;

7
                             Julie1@atg.wa.gov;

8
                             StephanieD1@atg.wa.gov;
                             torseaf@atg.wa.gov

9

10
     Gauri Shrotriya Locker:     GauriL@atg.wa.gov
                             Deannah1@atg.wa.gov

11
                             jasminer@atg.wa.gov
                             torseaf@atg.wa.gov

12

13
     Earl M. Sutherland:        EarlS1@atg.wa.gov

14
     All of the Office of the Attorney General – Torts Division

15
     800 Fifth Ave., Suite 2000
     Seattle, WA 98104

16
     Attorneys for Defendants

17

18
     DATED this 10th day of January, 2017.

19
                                  BUDGE & HEIPT, P.L.L.C.

20

21
                     By:     */s/ Edwin S. Budge*

22
                             Edwin S. Budge, WSBA #24182
                             Erik J. Heipt, WSBA #28113

23
                             Attorneys for Plaintiffs

24
25
26
27
28

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
705 SECOND AVENUE, SUITE 910
SEATTLE, WA  98104
TELEPHONE:  (206) 624-3060